**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Elizabeth Wells,         )
                                )
               Plaintiff,     )  Case No. 1:10-CV-619
                                )
      vs.                  )
                                )
Cincinnati Children's    )
Hospital Medical Center,  )
                                )
                                )
             Defendant.    )

O R D E R

      This matter is before the Court on Defendant Cincinnati Children's Hospital Medical Center's motion for summary judgment (Doc. No. 23). For the reasons that follow, Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**

I. Background

      Plaintiff Elizabeth Wells is currently a registered nurse in Cincinnati Children's Hospital Medical Center's ("CCHMC") bone marrow transplant unit but from 2003 to 2009 she worked in the Critical Airway Transplant Surgery unit. Plaint. Dep. at 10. The record rather vaguely defines this department's function as caring for transplant patients and high-acuity, i.e., seriously ill, patients. Keegan Dep. at 16. Plaintiff's duties within the Critical Airway are similarly ill-defined except that they obviously involved patient care and included such tasks as properly documenting patient records, administering narcotic medication, changing ostomy bags and dressings, starting IV's,

and briefing the on-coming shift nurses as to the status of her patients.  See generally Doc. No. 42-1, at 15-18.  Plaintiff consistently received good performance evaluations in the Critical Airway unit.

In 2008, Plaintiff began to experience gastrointestinal problems, including pain, vomiting, and diarrhea.  The vomiting and diarrhea caused Plaintiff to become dehydrated and experience an electrolyte imbalance.  Plaintiff underwent some procedures in 2008 to address these symptoms, including a cholecystecomy and removal of her gall bladder.  At various times, Plaintiff was prescribed oxycodone and morphine for pain.  Doc. No. 25-2, at 13.

Plaintiff applied for and received intermittent leave under the Family Medical Leave Act ("FMLA") for the period September 2, 2008 through March 4, 2009.  Doc. No., 25-4, at 6-7.  She applied for and received continuous FMLA leave for the period November 5, 2008 through November 30, 2008.  Doc. No. 25-4, at 8-10.  Plaintiff's request for renewal of intermittent FMLA leave for the period March 4, 2009 through September 4, 2009 was also approved.  Doc. No. 25-4, at 12.

In January 2009, Plaintiff advised her supervisors, Debra Ballinger and Lisa Keegan, that she had been prescribed and was taking morphine.  CCHMC's policy is that it is permissible for an employee to take prescription medication while on duty so

long as it does not affect her ability to perform her job. Ballinger Dep. (Doc. No. 26) at 39-41; Doc. No. 32-2, at 35.

In May 2009, Ballinger became aware of several instances of unusual or erratic behavior on Plaintiff's part that called into question, at least in her mind, Plaintiff's fitness to practice in the unit. These incidents include:

1. documenting ostomy care on a patient that did not have an ostomy.

2. going to the wrong room to start an IV.

3. providing a jumbled and confused report at the end of her shift.

3. asking her immediate supervisor if she wanted to go to lunch with a nurse who had left several hours earlier.

4. discussing with a charge nurse a patient who was being discharged when in actuality there was no patient being discharged.

5. pulling morphine for a patient who had no order for morphine.

6. calling in sick one morning and then reporting to work anyway, and then denying that she had called in sick in the first place.

Ballinger Dep. at 59-62; Doc. No. 42-1 at 15-48. While Plaintiff has explanations for all of these incidents, she does

not deny that they occurred. Plaint. Dep. at 32-36. Plaintiff in fact admits that she felt ill and was confused for about a four hour block of time in late April 2009. <u>Id.</u> at 68. Plaintiff also admitted that she "blacked out a little bit," <u>id.</u>, that she "felt like I was out of my body," and that she "was extremely confused and dizzy." Doc. No. 25-4, at 38. Plaintiff also admits in her brief that at this time she was taking Lotronex for her gastrointestinal condition, which has "dangerous side effects, including neurological ones like confusion, sedation, and equilibrium disorders." Doc. No. 38, at 11 (internal parentheses omitted)

In any event, these incidents cause Ballinger to consider whether they were just errors, whether Plaintiff was impaired because of her prescriptions, or whether she was diverting drugs. Ballinger Dep. at 70; Doc. No. 42-1, at 15. CCHMC, however, rather quickly ruled out drug diversion as the cause of Plaintiff's behavior. Rodell Dep. at 22; Doc. No. 32-2, at 44. An audit of the pyxis dispensing machine showed that her access was within normal limits and another nurse had witnessed her destruction of the morphine she had removed without an order. Doc. No. 42-1, at 4. Ballinger, Keegan, and Terri Thrasher, Director of the Employee Health Department, and Maria Rodell, Director of Employee Relations and Compliance, determined that the appropriate course of action was to suspend Plaintiff without

pay pending completion of a fitness-for-duty examination performed by CCHMC's third-party employee assistance plan ("EAP") provider, CONCERN.

Plaintiff was suspended on May 19, 2009 and referred to CONCERN. She was also required to submit to a breathalyzer test and provide a urine sample for a drug test. Doc. No. 42-1, at 16; Doc. No. 25-4, at 14. Plaintiff in fact tested positive for two different controlled substances but she was considered to have passed the drug test because the levels were within the limits of her prescriptions. Thrasher Dep. at 51-58. There was concern, nevertheless, that the amount of medication Plaintiff was taking affected her ability to practice safely. Id. at 54-55.

CONCERN referred Plaintiff to Dr. Michael Miller for a psychiatric evaluation. Dr. Miller provided a report to CONCERN dated May 27, 2009. Doc. No. 25-4, at 15-22. In addition to interviewing Plaintiff and having her complete an MMDP-2 test, Dr. Miller contacted her other health care providers, and obtained a list of her recent prescription fills. Dr. Miller's conclusions were damning. Dr. Miller felt that Plaintiff downplayed the seriousness of the events leading to her referral and that she was deceptive and in denial about her use of opiates, had little insight into her behaviors, was doctor-

shopping and had been engaging in drug-seeking behavior. Dr. Miller's ultimate conclusion was:

> I do not believe that she should be allowed to work in a clinical setting considering the documented problems in the referral packet and the persistent use of opiates and Apidex. She poses a critical risk to her patients in light of the problems documented by the CCHMC staff. She has not managed her medical condition in a mature and responsible manner. Instead, she has misused and abused opiates, which is of even greater concern considering that she had an incident at work which involved morphine. Her prognosis is guarded due to her minimalization, denial, and out-and-out dishonesty. Chemical dependency treatment is critical at this juncture.

Doc. No. 25-4, at 21 (emphasis in original).

On June 5, 2009, as a condition of remaining employed, CCHMC required Plaintiff to enter into a return-to-work agreement. Doc. No. 32-5, at 19. The agreement required Plaintiff to complete a treatment program indicated by CONCERN, take FMLA leave until completion of treatment, follow all the recommendations of CONCERN and the treatment provider, and submit to random drug testing for at least a period of two years. Id. CCHMC also required Plaintiff to take FMLA leave during her absence while fulfilling the return-to-work conditions.

Based on Dr. Miller's report, CONCERN referred Plaintiff to Recovery Works for a drug test and chemical dependency assessment. Doc. No. 25-3, at 9. Plaintiff's drug screen was negative for opiates, methamphetamines, cannabis, cocaine, and benzodiazapines. Doc. No. 25-2, at 29. The written

6

assessment of the chemical dependency counselor, Ed Tedder, dated
June 16, 2009, while not as harsh as Dr. Miller's report,
nevertheless had a guarded tone.  Tedder stated that, based on
Plaintiff's statements during the evaluation, he could not give a
clear opinion as to abuse or dependency although he did note that
some of her medications could have contributed to her aberrant
behavior.  Id.  Thus, Tedder provided no diagnosis but
recommended that Plaintiff participate in outpatient substance
abuse counseling to rule out abuse or dependence and to educate
Plaintiff on the effects on cognitive functioning of opiod use
and other prescription medications.  Id.  Tedder also recommended
that upon returning to work, Plaintiff be monitored closely and
subjected to random drug screens.  He also recommended that
Plaintiff be restricted from access to opiod medications and that
she be directly supervised if she were permitted to administer
pain medications.  Id.

CONCERN also referred Plaintiff to Dr. Richard Baum, a
psychologist, for substance abuse counseling.  Dr. Baum provided
a report to CONCERN dated July 7, 2009, after two counseling
sessions with Plaintiff. Doc. No. 25-4, at 40.  Dr. Baum
indicated that Plaintiff presented cogent arguments supporting
her contention that her use of prescription medications was
misconstrued as abuse.  Dr. Baum also indicated, however, that
Plaintiff understood why CCHMC was concerned that her health and

prescribed medications were negatively affecting her job. Dr.
Baum stated that Plaintiff agreed to continue with counseling in
order to support her return to work. Dr. Baum concluded,
however, that Plaintiff could return to work immediately while
treatment continued and that there was nothing in her current
behavior or affect that precluded her from performing her job.
The only restriction that Dr. Baum included was that Plaintiff be
subjected to drug screens for three months and that counseling be
terminated if they were all negative. Id.

Having received both Dr. Miller's report and Dr. Baum's
report, Plaintiff's CONCERN liaison, Barry Cobb, provided CCHMC
with his own list of recommendations on July 13, 2009. Doc. No.
25-3, at 9-10. Cobb recommended that if CCHMC accepted Dr.
Baum's opinion that Plaintiff was able to return to work, that
she have a drug screen on her first day. Cobb further
recommended that Plaintiff submit six drug screens a year for two
years. Furthermore, "[i]n view of the episodes (i.e. confusion,
errors in patient care) at work that initiated the fitness for
duty referral," Cobb recommended that Plaintiff be closely
monitored by her supervisors. Id.

On August 25, 2009, Dr. Baum provided a follow-up
report to CONCERN stating that he and Plaintiff had mutually
agreed to terminate counseling because she was not prepared to
admit that she had a substance abuse problem. Doc. No. 25-1, at

43. Dr. Baum noted that Plaintiff remained adamant that she had not abused her prescriptions and that he was unable to "develop the therapeutic alliance that would help determine the validity of her allegations, or to help her make the behavioral changes her employer was hoping for." Id.

On September 3, 2009, Plaintiff's own physician, Dr. Grogan, provided a note stating that she could return to work without restrictions. Doc. No. 25-4, at 43.

It is not clear on this record if there was ever a formal decision by CCHMC that Plaintiff had satisfactorily completed the fitness-for-duty evaluation or, if there was, who made it. The record does reflect that beginning on September 9, 2009, Mary Bellman, an internal recruiter for CCHMC, began searching for a placement for Plaintiff in another department. Doc. No. 25-6, at 4. Neither Ballinger or Keegan, it is fair to say, was convinced that Plaintiff's completion of the fitness-for-duty evaluation enabled her to work in the Critical Airway unit. Both Ballinger and Keegan testified that they told human resources that they did not want Plaintiff back in their unit unless she could take care of her patients safely. Ballinger Dep. at 101-05; Keegan Dep. at 45-46. Ballinger in particular indicated that she believed that Plaintiff had not successfully addressed her health issues, which, in turn, caused her to

believe that it was unsafe for Plaintiff to return to the Critical Airway unit. Ballinger Dep. at 102-04.

Plaintiff filled some temporary and less than full-time positions before obtaining her present position in the bone marrow transplant unit. In November 2009, Plaintiff worked in the flu clinic for two weeks administering flu shots. Then Plaintiff was assigned a position as a home health care nurse for a period of about six months. Both of these positions paid a lower hourly rate than she was earning in the Critical Airway unit. Plaintiff applied for a number of other positions within CCHMC during this time without success. See generally Doc. No. 25-6.

In addition to completing the fitness-for-duty evaluation, CCHMC required Plaintiff to self-report her suspension to the Ohio Board of Nursing ("OBN"). CCHMC also provided two reports on Plaintiff's suspension. On July 22, 2009, CCHMC submitted a report which summarized all of the incidents leading up to Plaintiff's suspension, its investigation into the incidents, and her referral for chemical dependency treatment. Doc. No. 42-1, at 4. The report stated that Plaintiff had tested positive for oxycodone and oxymorphine but failed to note that she had prescriptions for these drugs. Id.

On September 10, 2009, Rodell, on behalf of CCHMC, provided a follow-up report to the OBN on Plaintiff's suspension.

Plaintiff contends that this report had several false and defamatory statements in it, including a statement that Plaintiff's medical status was unknown despite the fact that she had been cleared to return to work and that "all" of the mental health professionals recommended that she not work in a clinical setting or under strict supervisory conditions, when in fact Dr. Baum placed no restrictions on her return to work. Doc. No. 42-1, at 5-7; Rodell Dep. at 97 (admitting that Dr. Baum placed no restrictions on Plaintiff's return to work).[1]

Plaintiff persistently maintained that she was not abusing her prescriptions throughout the fitness-for-duty evaluation. On May 29, 2009, Plaintiff emailed Keegan and Ballinger complaining that the process was taking too long. She maintained that she was not intoxicated at work and was not a drug user. She complained that she was being treated unfairly because she was sick at work one day. Doc. No. 25-4, at 23.

On May 30, 2009, Plaintiff emailed Thrasher vehemently objecting to Dr. Miller's assessment and report and explaining her course of treatment for her gastrointestinal problems. Doc. No. 25-4, at 24-27. Plaintiff sent another email objecting to

---

[1] Plaintiff also claims that in August 2010, during a substance abuse training class, an instructor impliedly referred to her as a nurse who was diverting and abusing drugs. As explained further, infra at 42-43, it is clear that this contention is based on hearsay and will not withstand summary judgment.

Dr. Miller's report to Ballinger on June 17, 2009. Doc. No. 25-4, at 30-32. On June 19, 2009, Plaintiff sent an email to Thrasher requesting copies of all of the medical reports from the fitness-for-duty evaluation. Doc. No. 25-4, at 34. Plaintiff also wrote, "I feel like I am being discriminated against because I have been sick." Id. In October 2009, one of Plaintiff's attorneys wrote a letter to CCHMC expressing concern that CCHMC was treating Plaintiff unfairly because of her "chronic illness" and her medication. Doc. No. 42-1, at 11.

Plaintiff filed a complaint charging disability discrimination with the Equal Employment Opportunity Commission in January 2010. Doc. No. 25-3, at 27-29. In September 2010, Plaintiff filed the instant complaint against CCHMC for alleged violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, et seq. Specifically, Counts I through IV of the complaint allege that CCHMC violated the ADA and the Ohio Civil Rights Act by discriminating against Plaintiff on the basis of disability, by retaliating against her, and by failing to accommodate her. Count V of the complaint alleges that CCHMC violated the FMLA by retaliating against Plaintiff and by not reinstating her to her former position on return from FMLA leave.

Counts VI and VII of the complaint assert state law claims for defamation and invasion of privacy, respectively.

At the conclusion of discovery, CCHMC filed the instant motion for summary judgment which is now ready for disposition.

## II. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in

13

dispute.  <u>Anderson</u>, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Id.</u> at 250.  "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

III. <u>Analysis</u>

A. <u>Americans with Disabilities Act/Ohio Civil Rights Act</u>

1. <u>Disability Discrimination</u>

Plaintiff presents disability discrimination and retaliation claims pursuant to the ADA and the Ohio Civil Rights Act.  The alleged discriminatory acts in this case occurred after January 1, 2009; therefore the Americans With Disabilities Act

14

Amendments Act of 2008 ("ADAAA") applies in this case.

Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 566-67

(6th Cir. 2009).  In order to establish a claim for disability

discrimination, the plaintiff must first establish that she is

"disabled" within the meaning of the Act.  McKay v. Toyota Motor

Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997).

Under the ADAAA, "disability" means:

(A) a physical or mental impairment that substantially
limits one or more major life activities of such
individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as
described in paragraph (3)).

42 U.S.C. § 12102(1).  Subsection 3 further defines the meaning

of "regarded as having an impairment":

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being
regarded as having such an impairment" if the
individual establishes that he or she has been
subjected to an action prohibited under this
chapter because of an actual or perceived physical
or mental impairment whether or not the impairment
limits or is perceived to limit a major life
activity.

(B) Paragraph (1)(C) shall not apply to impairments
that are transitory and minor.  A transitory
impairment is an impairment with an actual or
expected duration of 6 months or less.

42 U.S.C. § 12102(3).  In contrast to the pre-amendment statute,

under the ADAAA, a plaintiff proceeding under the "regarded as"

prong only has to prove the existence of an impairment to be

covered under the Act; she no longer is required to prove that
the employer regarded her impairment as substantially limiting a
major life activity.  See 29 C.F.R. § 1630.02(g)(3) ("the
'regarded as' prong of the definition of disability . . . does
not require a showing of an impairment that substantially limits
a major life activity or a record of such an impairment.").
Similarly, the Ohio Civil Rights Act does not require an
individual alleging that her employer regarded her as disabled to
show that the employer also believed that the perceived
disability limits a major life activity.  Ohio Rev. Code §
4112.01(13)("'Disability' means a physical or mental impairment
that substantially limits one or more major life activities,
including the functions of caring for one's self, performing
manual tasks, walking, seeing, hearing, speaking, breathing,
learning, and working; a record of a physical or mental
impairment; or being regarded as having a physical or mental
impairment."); Scalia v. Aldi, Inc., No. 25436, 2011 WL 6740756,
at *7–*8 (Ohio Ct. App. Dec. 21, 2011).

        There is sufficient evidence in the record to
demonstrate to a reasonable juror that CCHMC regarded Plaintiff
as disabled and took adverse employment action against the
Plaintiff on the basis of a perceived disability.  In reaching
this conclusion, the Court views the evidence as reflecting two
discrete instances of adverse employment action, one which

clearly was not discriminatory and one which a reasonable juror could find was discriminatory.

The first adverse employment action was Plaintiff's suspension in May 2009. A reasonable juror, however, could not find that CCHMC's initial decision to suspend Plaintiff pending the completion of a fitness-for-duty evaluation was due to discriminatory animus. As CCHMC correctly points out in its brief, an employer is entitled to require an employee to undergo a medical examination to determine the cause of the employee's aberrant behavior. <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d 804, 810 (6th Cir. 1999). In this case, while Plaintiff provides explanations for the incidents that led CCHMC to suspend her, she does not dispute that they occurred or that they were a legitimate cause for concern by her supervisors. Even Plaintiff admits that she blacked out for a four hour period and that the Lotronex she was taking at the time causes "dangerous side effects, including neurological ones like confusion, sedation, and equilibrium disorders." Doc. No. 38, at 11. It seems beyond any serious argument that a nurse cannot safely treat patients if she is taking medication which causes or may cause her to black out and become confused or disoriented. CCHMC was entitled to find out the cause of Plaintiff's practice errors and apparent lapses in judgment without violating the ADA. <u>Id.</u> at 810-13. To the extent that Plaintiff's federal and state disability

discrimination claims are based on the initial determination to suspend her pending a fitness-for-duty evaluation, CCHMC's motion for summary judgment is well-taken and is **GRANTED.**[2]

The second adverse employment action was CCHMC's determination not to reinstate Plaintiff to the Critical Airway unit when she returned to work in September 2009.[3] At a minimum, this action was adverse because Plaintiff was only able to work for a reduced amount of hours and at a significant pay cut. Moreover, Plaintiff's assignment to administer flu shots and work in home health care was likely adverse because these jobs were less distinguished and carried less responsibility than her job in the Critical Airway unit. Tepper v. Potter, 505 F.3d 508, 515 (6th Cir. 2007) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

_____

[2]   Federal and state disability discrimination claims are subject to the same evidentiary standards and may be evaluated concurrently.  Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 201 (6th Cir. 2010).

[3]   The Court also discusses the issue of Plaintiff's reinstatement to her former position in the context of her FMLA interference claim, infra, at 32-36.  However, whether Plaintiff was entitled to restoration under the FMLA has no bearing on whether CCHMC discriminated against Plaintiff on the basis of disability by not restoring her to the Critical Airway unit.  See 29 C.F.R. § 825.216(c)(FMLA regulations on employee's right to restoration)(stating that even if employee has no right to restoration under the FMLA, an employer's obligation to reinstate employee to position may be governed by the ADA).

responsibilities, or other indices that might be unique to a particular situation.").

In their briefs, the parties discuss Plaintiff's disability discrimination claims in the context of the McDonnell Douglas framework for analyzing indirect evidence of discrimination. The Court, however, finds that the record contains direct evidence that CCHMC perceived Plaintiff as being disabled and denied her reinstatement on that basis. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co. 319 F.3d 858, 865 (6th Cir. 2003). In this case, Ballinger indicated in her deposition that Plaintiff's impairment or impairments formed the basis of the decision not to reinstate her to the Critical Airway unit. Ballinger Dep. at 102-04.[4]

---

[4]     Ballinger testified in part as follows:

Q. Isn't that what the whole Fitness for Duty process is all about, to your understanding, deciding whether someone is safe or not to return to duty?

A. That's my understanding.

Q. And from your perspective, you didn't care one way or other whether the Fitness for Duty folks decided whether she was safe to return or not, you didn't want her back?

Additionally, Rodell's follow-up report to the OBN indicates that Plaintiff's health-related problems were the reason she was not reinstated to the Critical Airway unit. Rodell told the OBN that "[t]he risk of Ms. Wells repeating past errors and reverting to the behaviors that gave rise to her fitness for duty assessment is not one the management of A4North Surgery is willing to accept." Doc. No. 42-1, at 6. This evidence directly shows that CCHMC believed that Plaintiff's health condition precluded her from performing as a nurse in the Critical Airway unit.

Since there is direct evidence that Plaintiff's impairment or impairments were the reason she was not reinstated to the Critical Airway unit, the McDonnell Douglas burden-shifting format does not apply. Monette v. Electronic Data Sys., Inc., 90 F.3d 1173, 1184 (6th Cir. 1996). Rather, when there is direct evidence that the employer relied on the employee's disability in making an adverse employment decision, in order to

---

A. It was not whether or not they decided she was ready to come back, it was that she was still having medical issues, and those issues had caused her to have practice issues, or could have caused her to have practice issues.

Q. Are you suggesting that she wasn't capable of doing the job at that point in time?

A. I'm suggesting that I wasn't sure if she was capable of doing the job at that time.

Ballinger Dep. at 104 (emphasis added).

prevail on a disability discrimination claim, the plaintiff must prove that she is "disabled" within the meaning of the act and that she was otherwise qualified for the position with or without a reasonable accommodation, or with a alleged essential job function eliminated. Id. at 1186. If the plaintiff proves those two elements, the burden shifts to the employer to demonstrate that the challenged job criterion is essential or that a proposed accommodation will impose an undue hardship upon the employer. Id. Additionally, by statute, an employer has available an affirmative defense that employing the individual in the position in question will "pose a direct threat to the health and safety of other individuals in the workplace." 42 U.S.C. § 12113(b); see also 29 C.F.R. § 1630.2(r). In this case, there is sufficient evidence for Plaintiff to meet her burden of proof on the first two elements.

First, there is sufficient evidence for a juror to find that CCHMC regarded Plaintiff as being disabled. As discussed above, under the "regard as" prong, a plaintiff only needs to show that she has an impairment; she does not need to show that the impairment substantially limits a major life activity. A physical or mental impairment is:

> (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive,

> genitourinary, immune, circulatory, hemic, lymphatic,
> skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as an
> intellectual disability (formerly termed "mental
> retardation"), organic brain syndrome, emotional or
> mental illness, and specific learning disabilities.

29 C.F.R. § 1630.20(h). The gastrointestinal problems which

caused Plaintiff nausea, vomiting, and diarrhea clearly qualify

as a physiological disorder. Moreover, to the extent that the

side effects of Plaintiff's proper use of prescription medication

adversely affected her ability to work, it would contribute to a

finding that she was disabled. Sutton v. United Airlines, Inc.,

527 U.S. 471, 482 (1999) ("Looking at the Act as a whole, it is

apparent that if a person is taking measures to correct for, or

mitigate, a physical or mental impairment, the effects of those

measures-both positive and negative-must be taken into account

when judging whether that person is 'substantially limited' in a

major life activity and thus 'disabled' under the Act.").[5] And,

despite Dr. Miller's report, there is evidence that Plaintiff's

_____

[5]     The ADAAA only overruled Sutton to the extent that the
ameliorative effects of mitigating measures may not be taken into
consideration in determining whether an individual is disabled.
See 42 U.S.C. § 12102(4)(E).  Even after the enactment of the
ADAAA, the negative effects of mitigating measures are still a
relevant consideration in determining whether an individual is
disabled.  See Pub. L. No. 110-325 § 2(b)(2)(2008) (Statement of
Purposes for the ADAAA)("to reject the requirement enunciated by
the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S.
471 (1999) and its companion cases that whether an impairment
substantially limits a major life activity is to be determined
with reference to the ameliorative effects of mitigating
measures[.]").

22

use of prescription medication was appropriate.  The results of
Plaintiff's first drug test were within the limits of her
prescription and the second drug test detected no opiods or other
controlled substances at all.  To the extent that Plaintiff's
blackout, confusion, and disorientation were caused by Lotronex,
these would obviously be negative side affects of her attempts to
ameliorate her gastrointestinal condition.  Accordingly, the
record establishes sufficiently that Plaintiff is or was disabled
within the meaning of the ADAAA.

        Second, there is sufficient evidence for a reasonable
juror to conclude that Plaintiff was qualified to work in the
Critical Airway unit, even without a reasonable accommodation.
Plaintiff worked successfully as a nurse in the unit for a number
of years prior to 2009.  Plaintiff's gastrointestinal problems
were apparently adequately accommodated in 2008 by taking
intermittent FMLA leave.  During the first few months of 2009,
Plaintiff apparently was able to perform her job safely and
successfully even after she started on a prescription for
morphine.  There is evidence to suggest that Plaintiff's aberrant
behavior at work coincided with starting on Lotronex and stopped
when she stopped taking Lotronex.  As early as July 2009, Dr.
Baum stated that Plaintiff could return to work without any
restrictions at all.  All of these facts show that Plaintiff was
qualified to work in the Critical Airway unit upon her return

from the fitness-for-duty evaluation. Thus, the evidence supports that Plaintiff can establish a prima facie case of disability discrimination.

Although not articulated as such by CCHMC, the principal issue with respect to Plaintiff's disability discrimination claim is to what extent her medical condition and/or use of prescription medicine presented a direct threat to the health and safety of the patients. As indicated above, the burden to show that the individual presents a direct threat to the health and safety of others is on the employer. Regulations issued by the EEOC explain this defense:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r). In light of § 1630.2(r), the Court finds that CCHMC is not entitled to summary judgment on the "direct

threat" affirmative defense.  <u>See</u>, <u>e.g.</u>, <u>Bragdon v. Abbott</u>, 524 U.S. 624, 647 (1998) ("drawing guidance" from EEOC regulations interpreting the ADA to conclude that HIV is an impairment that substantially limits a major life activity).

CCHMC's position is essentially that it could not accommodate a nurse who blacks out and becomes confused when treating and administering narcotics to critically ill children. Doc. No. 23, at 8.  Elsewhere, CCHMC argues that Plaintiff presented a safety risk because she was still having the same medical issues that caused her to have practice problems and because she acknowledged that she stopped seeing her physicians to treat these problems.  A reasonable juror could conclude, however, that CCHMC's assessment of the risk Plaintiff presented to patients was not reasonable and/or not based on the most current information.  If Plaintiff were still having medical issues that might have caused her to have practice problems when she was released to return to work in September 2009, it was pointless for her to have gone through the fitness-for-duty evaluation in the first place and it makes even less sense that CCHMC would have concluded that she was fit to return to work in any capacity at the conclusion of it.  It seems evident that some of the practice problems that allegedly precluded her return to the Critical Airway unit are not unique to that practice area. For instance, accurately documenting patient charts and giving

accurate patient briefs at the change of a shift would seemingly apply in every department. Similarly, if Plaintiff were still blacking out and experiencing confusion at work, she presumably would not have been able to work in any department at the hospital. CCHMC, nevertheless, saw fit to allow Plaintiff to work in other areas of the hospital. Indeed, CCHMC acknowledges in its brief that Plaintiff has worked in the Bone Marrow Transplant unit for two years without incident, Doc. No. 23, at 10, which suggests Plaintiff no longer was experiencing significant medical issues when she returned from the fitness-for-duty evaluation and would not have experienced the black outs and confusion that caused her practice problems. Indeed, CCHMC states that the treatment that Plaintiff received during the fitness-for-duty evaluation was successful. Doc. No. 23, at 10. CCHMC tries to qualify this admission by stating that it was safe for Plaintiff to treat non-critically ill patients who do not require her to administer narcotic medications. CCHMC apparently overlooks its statements elsewhere, however, that Plaintiff currently administers narcotics in the Bone Marrow Transplant unit,[6] and it seems to the Court that children who receive bone marrow transplants are gravely ill as well. Therefore, CCHMC in fact undermines its rationale that Plaintiff could not return to work in the Critical Airway unit because she was a safety threat.

---

[6]    Doc. No. 48-1, at 1 (Rodell Aff. ¶ 3)

Additionally, a reasonable juror could conclude that CCHMC's determination that Plaintiff presented a health and safety risk was not based on the most current medical information. It may be true, as CCHMC alludes to in its brief, that at one point, Plaintiff told Ballinger that she had stopped seeing her doctors. Ballinger Dep. at 102-03. It is not evident specifically when Plaintiff made this statement, however. There is some evidence, though, that Plaintiff made statements to this effect several months before she returned to work, near the outset of the fitness-for-duty evaluation. See, Doc. No. 25-2, at 30 (Plaintiff's June 17, 2009 email to Ballinger stating that she is not going back to the doctor); see also Doc. No. 25-2, at 17 (Dr. Miller's May 27, 2009 report). In fact, CCHMC had available more contemporary medical evidence that Plaintiff was actually still receiving medical treatment for her gastrointestinal condition. Specifically, in September 2009, her own physician released her back to work without any restrictions. Doc. No. 25-4, at 43. Similarly, CCHMC acknowledged in its September 10, 2009 report to the OBN that Plaintiff was still taking prescribed medications - evidence that CCHMC was aware that Plaintiff was in fact still being treated for her condition. Doc. No. 32-4, at 32. Moreover, CCHMC apparently gave little or no serious consideration to Plaintiff's contention that the Lotronex - and not opiod abuse - was the principal cause of her

practice problems and that the risk of future similar practice problems would be significantly reduced or eliminated when she stopped taking Lotronex.

In short, a reasonable juror could conclude that CCHMC did not consider all of the currently available information in concluding that Plaintiff presented a health and safety risk if she returned to work in the Critical Airway unit. Consequently, CCHMC is not entitled to summary judgment on this affirmative defense.

For all of the reasons stated above, CCHMC's motion for summary judgment on Plaintiff's disability discrimination claims is **GRANTED IN PART AND DENIED IN PART.** To the extent that Plaintiff's disability discrimination claims are based on the initial decision to suspend her pending completion of a fitness-for-duty evaluation, CCHMC's motion for summary judgment is well-taken and is **GRANTED**. To the extent that Plaintiff's disability discrimination claims are based on CCHMC's decision to deny Plaintiff reinstatement to the Critical Airway unit, CCHMC's motion for summary judgment is not well-taken and is **DENIED.**

## 2. Failure to Accommodate

Plaintiff also claims that CCHMC violated the disability discrimination laws by failing to accommodate her disability and by failing to engage in the interactive process to find her a reasonable accommodation. The Court first notes,

however, that to the extent that Plaintiff is proceeding under the "regarded as" prong of the ADA, pursuant to the ADAAA, an employer has no duty to accommodate an employee it regards as disabled. 42 U.S.C. § 12201(h); 29 C.F.R. § 1630.9(e). This in fact was the law in this Circuit prior to the enactment of the ADAAA. Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999). Accordingly, to the extent that Plaintiff is proceeding under the "regard as" definition of disability, CCHMC is entitled to summary judgment on her failure to accommodate claim.

To the extent that Plaintiff is proceeding under the actual disability or record of disability definitions, however, CCHMC is still entitled to summary judgment on her failure to accommodate claim. The Court agrees with CCHMC that when Plaintiff experienced confusion and black outs at work, there would have been no way for CCHMC to reasonably accommodate these conditions. It seems self-evident that there are no circumstances under which a nurse experiencing these problems can be safely or reasonably accommodated to treat patients.

To the extent that Plaintiff's failure to accommodate claim is based on events that occurred when she returned from the fitness-for-duty evaluation, it is not apparent that she actually needed any accommodations, except perhaps a need for continuing intermittent FMLA leave. Plaintiff's own physician released her to work with no restrictions at all in September 2009. Doc. No.

25-4, at 43.  Even Plaintiff indicated in her June 17, 2009 email to Ballinger that there was no medical reason she could not return to work.  Doc. No. 25-2, at 30.

In any event, the employee bears the burden of proposing a reasonable accommodation, Monette, 90 F.3d at 1183, and there is no evidence in this record that Plaintiff ever proposed an accommodation to CCHMC when she completed the fitness-for-duty evaluation.  Since Plaintiff never requested a reasonable accommodation, CCHMC had no duty to engage in an interactive process to find an accommodation for her. Breitfelder v. Leis, 151 Fed. Appx. 379, 385-86 (6th Cir. 2005); Lockard v. General Motors Corp., 52 Fed. Appx. 782, 788 (6th Cir. 2002).

Accordingly, CCHMC's motion for summary judgment on Plaintiff's failure to accommodate claim is well-taken and is **GRANTED.**

## C. Retaliation

Plaintiff also claims that CCHMC violated the ADA and the Ohio Civil Rights Act by retaliating against her for engaging in protected activity.  CCHMC argues that it is entitled to summary judgment on this claim because Plaintiff never engaged in any protected activity or, alternatively, because there is no causal connection between the protected activity and any adverse employment actions.  The Court concludes that a reasonable juror probably could find that Plaintiff engaged in protected activity.

As recounted earlier, Plaintiff objected in several emails to the entire fitness-for-duty process and stated in at least two of the emails that she felt like she was being discriminated against. Doc. No. 25-3, at 184; Doc. No. 25-2, at 31. Additionally, a few of her emails make reference to initiating legal proceedings against CCHMC. E.g., Doc. No. 25-2, at 23. In October 2009, one of Plaintiff's attorneys wrote a letter to CCHMC expressing concern that CCHMC was treating Plaintiff unfairly because of her "chronic illness" and her medication. Doc. No. 42-1, at 11. The Court nevertheless agrees that there is no evidence of a causal connection between the protected activity and any adverse employment actions.

The decision to suspend Plaintiff pending the fitness-for-duty evaluation preceded her protected activity. Therefore, there cannot have been a causal connection between these two events.

Moreover, there is no evidence of a causal connection between Plaintiff's protected activity and the decision not to reinstate her to the Critical Airway unit. As discussed extensively before, it appears that the reason that Plaintiff was not reinstated to the Critical Airway unit was her medical impairment. While, if true, this would constitute disability discrimination, it would not constitute retaliation. Indeed, the explicit reliance on Plaintiff's medical impairment to deny her

reinstatement rather soundly defeats any contention that her protected activity played a part in the decision not to reinstate her. Additionally, the record shows that Mary Bellman worked assiduously to find another appropriate placement for Plaintiff. Terri Thrasher, who coordinated the fitness-for-duty process in the first place, hired Plaintiff to work in her flu clinic and gave Plaintiff a positive recommendation for other positions. Doc. No. 25-6, at 3, 12. The record also shows that, except for reinstating Plaintiff to the Critical Airway unit, CCHMC worked cooperatively with Plaintiff's counsel to find her another appropriate full-time position. See Doc. No. 25-6, at 23-27. A reasonable juror simply could not find based on this record that CCHMC retaliated against Plaintiff for engaging in protected activity. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Accordingly, CCHMC's motion for summary judgment on Plaintiff's disability retaliation claims is well-taken and is **GRANTED.**

### B. FMLA Interference Claims

There are two types of FMLA interference claims. The first is an entitlement claim in which the employer fails to provide the employee with entitlements provided by the FMLA, such as reinstatement after taking medical leave. Edgar v. JAC Prod., Inc., 443 F.3d 501, 507 (6th Cir. 2006). The second is a

retaliation claim in which the employer retaliates against the employee for having exercised his or her rights under the FMLA. Id. at 508.  Plaintiff alleges both types of claims in this case.

1. <u>Interference</u>

Under the FMLA, a qualifying employee is entitled to twelve weeks of unpaid leave per year if she has a serious health condition which renders her unable to perform the essential functions of her position.  29 U.S.C. § 2612(a)(1)(D).  Moreover, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a).  One of the rights embodied in the FMLA is the employee's right to return to her former position, or to an equivalent position, upon her return from FMLA leave.  29 U.S.C. § 2614(a)(1).  However, in order to be entitled to restoration, the employee must return to work before the expiration of the twelve week leave period and be able to perform all of the essential functions of her job. <u>Edgar</u>, 443 F.3d at 506; <u>Hoge v. Honda of Am. Mfg., Inc.</u>, 384 F.3d 238, 245-46 (6th Cir. 2004).  To prevail under an FMLA interference theory, the employee must establish the following elements:

1) she is an "eligible employee";

2) the defendant is an "employer";

3) the employee was entitled to leave under the FMLA,

> 4) the employee gave the employer notice of her
> intention to take leave,
>
> 5) the employer denied the employee FMLA benefits to
> which she was entitled.

Wysong v. Dow Chemical Co., 503 F.3d 441, 447 (6th Cir. 2007).

Plaintiff alleges that CCHMC violated her FMLA right to

restoration to her position in the Critical Airway unit when she

returned from leave. CCHMC contends that Plaintiff was not

entitled to restoration because her twelve weeks of leave had

expired by the time she returned to work. Thus, for purposes of

the present motion only the first and fifth elements are at

issue.

The record shows that as of June 4, 2009, Plaintiff had

286 hours of FMLA leave available. Doc. No. 25-5, at 36.

Assuming a 40 hour work week, Plaintiff's had available about

seven weeks of FMLA leave, which would have been exhausted

approximately July 24, 2009. Thus, as CCHMC argues, by September

2009 Plaintiff's FMLA leave had expired and, as consequence, at

that particular time she would not have been entitled to

restoration to her former position. Plaintiff points out,

however, that Dr. Baum cleared her to return to work on July 7,

2009, before the expiration of the twelve week period. CCHMC, on

the other hand, points out that both Dr. Miller and Barry Cobb

reported that Plaintiff should be closely monitored when she

returned work and that it would not have been possible to closely

34

monitor Plaintiff while she was performing her job.  In other words, CCHMC contends that Plaintiff was not entitled to restoration on July 7, 2009 because she could not perform all of the essential functions of her job at that time.  The Court concludes, however, that there is a material issue of fact whether Plaintiff could perform all of the essential functions of her job before the expiration of her FMLA leave.  Therefore, summary judgment in favor of CCHMC on Plaintiff's FMLA interference claim is not appropriate.

As Plaintiff correctly argues, as of July 7, 2009 Dr. Baum, who at that point was Plaintiff's treating substance abuse counseling provider, stated that she could return to work immediately and, moreover, that there was nothing about the ongoing counseling that would preclude her from returning to work.  Dr. Baum placed no other conditions on her return to work and, in fact, recommended terminating counseling immediately if Plaintiff passed three drug tests.  The Court recognizes that CCHMC was presented with opinions from Dr. Miller and Dr. Cobb stating that Plaintiff should be closely monitored but there is nothing in the record that indicates that CCHMC was required to accept those opinions over Dr. Baum's opinion.  A juror might reasonably conclude that the opinion of Dr. Baum, who was actually treating Plaintiff at the time, was a more accurate evaluation of Plaintiff's ability to perform all of the functions

of her former position, as opposed to those opinions which were based upon a one-time examination of Plaintiff.

The Court also recognizes that Plaintiff was a party to the return to work agreement which established certain conditions that would allow her to resume nursing a CCHMC. An employer, however, may not require an employee to take more leave than is necessary to address the medical circumstances for which leave was taken. Hoge, 384 F.3d at 247; 29 C.F.R. § 825.311(c). Moreover, employees cannot waive their rights under the FMLA and an employer may not induce or coerce employees into waiving their FMLA rights. Id. at 252; 29 C.F.R. § 825.220(d). Reading these two rules together it becomes apparent to the Court that if in fact Plaintiff was able to perform all of the essential functions of her job on July 7, 2009, as Dr. Baum indicated in his letter, then CCHMC could not avoid liability for not reinstating Plaintiff to her position by relying on the return to work agreement.

In summary, there is a conflict in the evidence whether Plaintiff was able to perform the essential functions of her position, and thus entitled to restoration, before her FMLA leave expired. Accordingly, CCHMC's motion for summary judgment on Plaintiff's FMLA interference claim is not well-taken and is **DENIED.**

## 2. Retaliation

Plaintiff also alleges that CCHMC retaliated against her for taking FMLA leave. In order to prevail on an FMLA retaliation claim, a plaintiff must establish that 1) she availed herself of a protected right under the FMLA by notifying the employer of her intent to take leave, 2) she suffered an adverse employment action, and 3) that there is a causal connection between the exercise of her rights under the FMLA and the adverse employment action. Edgar, 443 F.3d at 508. If the plaintiff establishes these elements, the burden shifts to the employer to proffer a legitimate, non-retaliatory reason for discharging the employee. Id. If the employer carries this burden, the plaintiff must show that the reasons advanced by the employer are pretextual. Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 316 (6th Cir. 2001). On this record, no reasonable juror could conclude that there is a causal connection between any of the adverse employment actions and Plaintiff's exercise of her rights under the FMLA.

First, Plaintiff had been on intermittent FMLA leave for over a year at the time she was suspended in May 2009. In addition she had taken about a month of continuous FMLA leave in November 2008. Plaintiff was not subjected to any adverse employment consequences at all during this year-long period. Therefore, any temporal connection between her use of FMLA leave

and the decision to suspend her is tenuous at best. See, e.g., Anderson v. Avon Products, Inc., 340 Fed. Appx. 284, 288 (6th Cir. 2009) (no causal connection where six months separated the plaintiff's use of FMLA leave and the adverse employment action).

Second, the record almost indisputably establishes that the decision to suspend Plaintiff was precipitated by her unusual behavior in April and May 2009. Even Plaintiff admits that she blacked out and became confused at work and at the time was taking medication that could cause serious neurological side effects. In light of those compelling facts, no juror could conclude that retaliation was the motive for suspending Plaintiff.

Third, no reasonable juror could conclude that retaliation was the reason that CCHMC did not allow Plaintiff to return to work earlier or restore her to her position in the Critical Airway unit. Initially, the Court notes that CCHMC actually required Plaintiff to use her available FMLA leave during the fitness-for-duty evaluation. It seems highly unlikely that an employer would require an employee to use FMLA leave to address a serious medical condition and then retaliate against that employee for having done so. Moreover, the record rather plainly demonstrates that all of CCHMC's actions during this period were driven by the perhaps erroneous conclusion that Plaintiff was abusing opiods and was in denial about her

substance abuse problem.  As regrettable as that conclusion was,
it was a conclusion not related to Plaintiff's use of FMLA leave.
Similarly, the record rather plainly demonstrates that the
decision not to reinstate Plaintiff to the Critical Airway unit
was an erroneous belief that Plaintiff had stopped seeking
treatment for her medical problems.  Again, however, even if this
conclusion was erroneous, it is a reason unrelated to Plaintiff's
use of FMLA leave.  Finally, as already discussed, the record
shows that CCHMC worked diligently to find another placement for
Plaintiff once she returned from FMLA leave – behavior that
substantially dissipates any inference of a retaliatory motive.

Based on this record, a reasonable juror could not
conclude that CCHMC retaliated against Plaintiff for exercising
her rights under the FMLA.  <u>Reeves v. Sanderson Plumbing Prods.,
Inc.</u>, 530 U.S. 133, 148 (2000).  Accordingly, CCHMC's motion for
summary judgment on Plaintiff's FMLA retaliation claim is well-
taken and is **GRANTED.**

## C. <u>Defamation</u>

Plaintiff alleges that CCHMC defamed her in September
2009 by providing the OBN an incomplete and misleading report

which implied she was a controlled substance abuser.[7]  A

defamation claim has four elements:

> 1) a false and defamatory statement concerning another;
>
> 2) an unprivileged publication to a third party;
>
> 3) fault amounting at least to negligence on the part of the publisher; and
>
> 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc., 611

N.E.2d 955, 962 (Ohio Ct. App. 1992) (citing Restatement (Second)

of Torts 155, Section 558 (1977)).  CCHMC denies that it defamed

Plaintiff in its report to the OBN, but argues in any event that

its statements about Plaintiff were protected by both common law

and statutory privilege.  The Court agrees with CCHMC that, at a

minimum, its report to the OBN is protected by statutory

privilege.

> Section 4723.341 of the Ohio Revised Code provides:
>
> In the absence of fraud or bad faith, no person reporting to the board of nursing or testifying in an adjudication conducted under Chapter 119 of the Revised Code with regard to alleged incidents of negligence or

---

[7]     Plaintiff originally alleged that CCHMC defamed her in a substance abuse training session by using her as an example of a nurse who was abusing controlled substances.  The record is clear at this point, however, that this defamation claim not only occurred outside of the limitations period, but was also based on inadmissible hearsay statements.  Sabouri v. Ohio Dept. of Job & Family Serv., 763 N.E.2d 1238, 1241 (Ohio Ct. App. 2001); see infra, at 42-43.  Plaintiff has apparently abandoned this incident as the basis of her defamation claim.

> malpractice or matters subject to this chapter or
> sections 3123.41 to 3123.50 of the Revised Code and any
> applicable rules adopted under section 3123.63 of the
> Revised Code shall be subject to either of the
> following based on making the report or testifying:
>
> (1) Liability in damages in a civil action for injury,
>     death, or loss to person or property;
>
> (2) Discipline or dismissal by an employer.

Ohio Rev. Code § 4723.641(B).  CCHMC's September 2009 follow-up report to the OBN clearly was in regard to incidents which indicated that Plaintiff's ability to practice safely was impaired and, therefore, is privileged unless there is sufficient evidence of fraud or bad faith.  <u>See</u> Ohio Rev. Code § 4723.34(A)(1) and Ohio Rev. Code §§ 4723.28(B)(10) & (11) (collectively requiring employers of nurses to report to the OBN conduct indicating that a nurse's ability to practice safely is impaired by excessive use of drugs, alcohol, or other chemical substances or when nurse's ability to practice safely is impaired because of physical or mental disability).  Plaintiff's brief fails to point to any evidence suggesting that CCHMC's report to the OBN, although perhaps inaccurate and misleading, was made in bad faith or with some fraudulent intent.  Having reviewed the entire record, the Court concludes that there is no evidence of fraud or bad faith on the part of CCHMC in making this report. Therefore, the report was privileged under § 4723.341.

Accordingly, CCHMC's motion for summary judgment on Plaintiff's defamation claim is well-taken and is **GRANTED.**

D. <u>Invasion of Privacy</u>

Finally, Plaintiff asserts a claim against CCHMC for invasion of privacy. The elements of an invasion of privacy claim are:

> 1) there was publicity about the individual the disclosure must be of a public nature, not private;
>
> 2) the facts disclosed concerned an individual's private life, not her public life;
>
> 3) the matter publicized would be highly offensive and objectionable to a reasonable person of ordinary sensibilities;
>
> 4) the publication was made intentionally, not negligently; and
>
> 5) the matter publicized was not of legitimate concern to the public;

<u>Curry v. Village of Blanchester</u>, Nos. CA2009-08-010, CA2009-08-012, 2010 WL 2807948, at *11 (Ohio Ct. App. July 19, 2010). Plaintiff's invasion of privacy claim is specifically based on the training session which allegedly implied that Plaintiff was abusing controlled substances. Doc. No. 38, at 37-38.

As already indicated, and as CCHMC correctly argues, Plaintiff cannot prevail on this claim because it is based on hearsay. The only evidence that anyone implicated Plaintiff as a substance abuser in a training session is Plaintiff's testimony that another nurse, Amy Ross, told her that during a training exercise a speaker referred to a nurse with a PICC line who had been abusing drugs. Plaint. Dep. at 123-24. Plaintiff also

claims that other unidentified employees told her than this statement was made in the training session. Id. Plaintiff, however, has no witness with firsthand knowledge that these allegedly intrusive comments were made. Her own testimony, of course, is hearsay and inadmissible to establish this claim. U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997) (in ruling on a motion for summary judgment "hearsay evidence . . . must be disregarded.").

Accordingly, CCHMC's motion for summary judgment on Plaintiff's invasion of privacy claim is well-taken and is **GRANTED.**

## Conclusion

For the reasons stated in this order, Defendant Cincinnati Children's Hospital Medical Center's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** To the extent that Plaintiff's disability discrimination claims are based on the decision to suspend her pending a fitness-for-duty evaluation, the motion for summary judgment is well-taken and is **GRANTED.** To the extent that Plaintiff's disability discrimination claims are based on the decision not to restore her to her former position in the Critical Airway unit, the motion for summary judgment is not well-taken and is **DENIED.** To the extent that Plaintiff's disability discrimination claims are based on an alleged failure to accommodate, the motion for

summary judgment is well-taken and is **GRANTED.**  To the extent Plaintiff alleges that CCHMC retaliated against her in violation of the disability discrimination statutes, the motion for summary judgment is well-taken and is **GRANTED.**

To the extent Plaintiff alleges that CCHMC violated the FMLA by not reinstating her to the Critical Airway unit, the motion for summary judgment is not well-taken and is **DENIED.**  To the extent that Plaintiff alleges that CCHMC retaliated against her for taking FMLA leave or exercising other FMLA rights, the motion for summary judgment is well-taken and is **GRANTED.**

CCHMC's motion for summary judgment on Plaintiff's defamation and invasion of privacy claims is well-taken and is **GRANTED.**

**IT IS SO ORDERED**

Date February 14, 2012                    s/Sandra S. Beckwith
                                        Sandra S. Beckwith
                              Senior United States District Judge